IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WAYNE ARTHUR JORDAN,                    *

     Plaintiff,                              *

v.                                      *        Civil Action No. GLR-21-3048

THOMAS SELTZER, et al.,                 *

     Defendants.                             *
                              ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Thomas Seltzer, Walter West, Vanessa Anderson, Stephen Sanders, Robert L. Green, J. Phillip Morgan, the Maryland Department of Public Safety and Correctional Services ("DPSCS"), and the Maryland Correctional Enterprise's ("MCE")[1] (collectively, "Defendants") Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 25). The Motion is ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant Defendants' Motion, construed as one for summary judgment.

## I.      BACKGROUND

### A.   Jordan's Allegations

Jordan is a state prison inmate presently housed at Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland. (Am. Compl. at 3, ECF No. 23). He states that on January 10, 2019, while housed at Eastern Correctional Institution ("ECI"), he was

---

[1] The Clerk will be directed to correct the docket to reflect the full and proper names of Defendants.

assaulted and left blind in his right-eye. (Id. at 6). On January 16, 2019, Thomas Seltzer terminated him from his employment at MCE. (Id.). On February 13, 2019, Captain Mitchell[2] stated that Jordan would be permitted to return to work when he was medically cleared. (Id. at 7). Warden Walter West also stated that Jordan would be able to return to work at MCE when medically cleared. (Id.). Sometime in February 2019, Seltzer advised Jordan that "MCE's insurance would not cover his return to work, due to having one eye." (Id.).

On February 27, 2019, Dr. Mishra-Wilmer Ege authorized Jordan to return to work. (Id.). On March 6, 2019, Dr. Matera from ECI, in response to Dr. Mishra's letter, cleared Jordan to return to employment with MCE. (Id.). On April 9, 2019, Jordan advised Mishra that ECI and MCE reported that they had not received the return-to-work authorization. (Id.). Accordingly, Mishra sent a second authorization and provided Jordan a copy of it. (Id.). On April 18, 2019, Dr. Jason Clem, ECI Regional Medical Director, confirmed to Classification Counselor Anderson that Jordan was cleared to return to work. (Id. at 8).

On July 23, 2019, Seltzer advised Jordan that his return to work was delayed due to environmental dust. (Id.). On August 29, 2019, Jordan asked Anderson when he would be able to return to work since he had been medically cleared and also advised her that seven new people had recently been hired by MCE. (Id.). Anderson responded that Jordan was on the waiting list for MCE. (Id.).

---

[2] Jordan does not include Mitchell's full name and the Court has been unable to identify it in the record.

On October 2, 2019, Jordan sent a request slip to West regarding his return to work at MCE and asked whether he should focus on that or on a transfer to JCI for employment. (Id.). The following day, Anderson responded again advising Jordan that he was on the wait list for MCE and she was not sure how long it would take because hiring was handled by MCE. (Id.). She also asked if Jordan wanted to be placed on the transfer list for JCI. (Id.).

On December 13, 2019, Jordan was transferred to Md. Correctional Training Center ("MCTC"), which, in his view, occurred in order to prevent his return to work at ECI-MCE. (Id. at 9). On March 3, 2020, he was transferred to Western Correctional Institution ("WCI"), a maximum-security facility, which Jordan contends was "in furtherance of abuse of power, vindictive, malicious, reckless disregard for Plaintiff's rights." (Id.). On July 8, 2021, he was transferred to RCI, a medium security facility. (Id.).

As a result of the described conduct, Jordan contends that he lost property by confiscation, and it was deliberately damaged by unidentified WCI staff. (Id.). He lost diminution credits and wages. (Id. at 9). He further contends that he has been denied medical care "for his eye and plethora of other medical issues." (Id.).

**B.    Defendants' Response**

On October 14, 2016, Jordan was assigned to the MCE Textile Shop at ECI. (Decl. Vanessa Anderson ["Anderson Decl."] ¶ 4, ECF No. 25-4). Defendants offer that Jordan was provided a copy of MCE Rules and Regulations (ECF No. 25-3), which provide, in part, that inmates who are transferred are not guaranteed to be placed in the same job they

held in the previous business unit. (Rules & Regs. at 6, ECF No. 25-2). Further, the Plant Manager at each facility decides job placement on a case-by-case basis. (Id.).

Jordan was transferred to JCI on March 16, 2017 to complete an evaluation for the Maryland Parole Commission. (Anderson Decl. ¶ 5). On April 4, 2017, Jordan returned to ECI, and the following day, Anderson met with him for orientation. (Id. ¶¶ 6–7). During the meeting, Jordan requested to be returned to the MCE Textile shop. (Id. ¶ 7). Anderson emailed Thomas Seltzer, the Plant Manager, regarding Jordan's employment, and Seltzer confirmed that Jordan could return to work at MCE. (Id.). Jordan was approved for work and returned to work on April 6, 2017. (Id. ¶ 8).

On February 1, 2019, Anderson received notice from Dr. Clem that Jordan suffered an eye injury which resulted in loss of vision, and at that time, Jordan was unable to work. (Id. ¶ 9; Email Corr. at 2, ECF No. 25-6). As a result of the notice from Clem, Anderson reclassified Jordan from the MCE textile shop to medically unassigned. (Anderson Decl. ¶ 10).

The following week, Vanessa Giddens, CCMSII emailed Clem for an update as to Jordan's work status, inquiring whether he was to continue as medically unassigned or whether he could return to work. (Id. ¶ 11; Email Corr. at 3). Clem advised that the ophthalmologist had not cleared Jordan to return to work. (Anderson Decl. ¶ 11). Anderson followed up with Clem on March 25, 2019, regarding Jordan's clearance for work and Clem again advised that Jordan was not cleared to return to work. (Id. ¶ 12; Email Corr. at 4).

On April 18, 2019, Jordan forwarded a note from Dr. Mishra, which stated that Jordan could return to light duty and needed eye protection for his left eye. (Anderson Decl. ¶ 13; Email Corr. at 7). Anderson emailed Clem and asked that Jordan be cleared to return to work. (Email Corr. at 7). Clem approved the request and indicated Jordan could return to light duty with eye protection. (Id.). Anderson forwarded Clem's email to Seltzer. (Anderson Decl. ¶ 14; Email Corr. at 7). Seltzer advised Jordan that there were no vacancies at that time, but that he was added to the MCE waiting list.[3] (Anderson Decl. ¶ 14; Email Corr. at 11). An email was also sent to Amy Gragg, CCMM to place Jordan on the MCE waiting list and Jordan was advised that he was placed on the list. (Anderson Decl. ¶ 14; Email Corr. at 10).

On November 16, 2019, A. McCabe CCMSII entered a note that Jordan requested to be placed on the medium security transfer list. (Anderson Decl. ¶ 15). Case management notes indicate Jordan had been on the transfer list since June 2018. (Case Mgmt. Notes at 8, ECF No. 25-5). Jordan was transferred to MCTC on December 13, 2019. (Anderson Decl. ¶ 16). He was transferred to WCI on March 2, 2020 and to RCI, where he currently resides, on July 8, 2021. (Id. ¶ 17).

**C.   Procedural History**

On November 19, 2021, Jordan filed a Complaint against Seltzer, West, Case Anderson, CEO-MCE Stephen Sander, sand Secretary of DPSCS Robert L. Green. (ECF

---

[3] On July 24, 2019, Seltzer responded to an inquiry from Jordan advising that medical had placed a "hold" on Jordan due to environmental dust. (July 24, 2019 Resp. at 15, ECF No. 27-3).

No. 1). He later sought and was granted leave to file an Amended Complaint (ECF Nos. 19, 22), and on August 31, 2022, Jordan filed an Amended Complaint clarifying and reasserting his claims, naming Seltzer, West, Anderson, Stephen Sanders, Robert L. Green, DPSCS, J. Phillip Morgan, and MCE as Defendants. (Am. Compl. at 1, ECF No. 23). Jordan asserts that his claims arise under the Rehabilitation Act, Americans with Disability Act, as well as the First, Eighth, and Fourteenth Amendments. (Id. at 9–10, 12–13). He also alleges that Defendants "are responsible for establishing, developing, and maintaining policies, procedures, practice and/or customs regarding hiring and treatment of prisoners confined in DPSCS facilities and working in MCE industries." (Id. at 11). Lastly, he alleges that "Defendants deliberately and consciously neglected/failed to properly train, supervise, and instruct MCE & DPSCS staff with respect to lawful hiring/job policy, action, and omission toward treatment of prisoner with disabilities." (Id.). He seeks declaratory, preliminary, and permanent injunctive relief as well as compensatory and punitive damages. (Id. at 15).

On September 30, 2022, Seltzer, West, Anderson, Sanders, Green, Morgan, DPSCS, and MCE filed the subject Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 25). On October 13, 2022, Jordan filed an Opposition. (ECF No. 27). Defendants did not file a reply.

## II.    DISCUSSION

**A.    <u>Standards of Review</u>**

**1.    Conversion**

Defendants' Motion is styled as a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for Summary Judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. <u>See</u> <u>Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P.12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. <u>See</u> <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are

deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright,

Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs, 55 F.3d 943, 954 (4th Cir. 1995)).

Here, the Court concludes that both requirements for conversion are satisfied. Jordan was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion as a motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Jordan about the Motion and need to file an opposition. See Rule 12/56 Notice, ECF No. 26. Jordan filed an Opposition, as well as a declaration in support of his claims, but did not include a request for more time to conduct further discovery. (See generally Pl.'s Decl. Opposing Dismissal Summ. J. ["Opp'n"], ECF No. 27). He generally alleges that summary judgment should not be granted before discovery is completed, but he does not identify what discovery he seeks or why he is unable to oppose the dispositive motion. (Id. at 14). Because the Court will consider documents outside of Jordan's Complaint in resolving Defendants' Motion, the Court will treat the Motion as one for summary judgment.

### 2.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.    Analysis**

**1.    Exhaustion**

The Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134 § 803, 110 Stat. 1321 (1996) (codified as amended at 42 U.S.C. § 1997e(a)), governs cases brought by inmates in federal court. 42 U.S.C. § 1997e(a) states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Chase v. Peay, 286 F.Supp.2d 523, 528 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading standard on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. See Jones v. Bock, 549 U.S. 199, 216 (2007); see also Anderson v. XYZ Corr. Health Services, Inc., 407 F.2d 674, 682 (4th Cir. 2005). A claim that has not been exhausted may not be considered by this Court. See Jones, 549 U.S. at 220. In other words, exhaustion is mandatory, and a court usually may not excuse an inmate's failure to exhaust. See Ross v. Blake, 136 S.Ct. 1850, 1856–57 (2016).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. Moore v. Bennette, 517 F.3d 717, 725, 729 (4th Cir. 2008); see also Langford v. Couch, 50 F.Supp.2d 544, 548 (E.D.Va. 1999) ("The second PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). This

requirement is one of "proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits)." <u>Woodford</u>, 548 U.S. at 90 (quoting <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1024 (7th Cir. 2002)). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." <u>Aquilar-Avellaveda v. Terrell</u>, 478 F.3d 1223, 1225 (10th Cir. 2007).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office against any Division of Correction ("DOC") official or employee. Md. Code Ann., Corr. Servs. ("C.S.") § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. <u>See</u> C.S. § 10-206(b). Inmates housed at an institution operated by the Department of Public Safety and Correctional Services ("DPSCS") may avail themselves of the administrative grievance process designed for inmate complaint resolution. <u>See generally</u> C.S. § 10-201 <u>et seq.</u>; Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining an ARP).

A prisoner in a Maryland Division of Corrections ("DOC") institution must file an ARP with his facility's managing official within thirty days of the date on which the incident occurred, or within thirty days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B). If the managing official denies the ARP, the prisoner has thirty days to file an appeal with the Commissioner of Corrections. <u>Id.</u> 12.02.28.14(B)(5). If the Commissioner of Corrections denies the appeal, the prisoner has thirty days to file a

grievance with the IGO. Id. 12.02.28.18. The prisoner must include in the grievance copies of the initial request or administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. Id. 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); see also COMAR 12.07.01.07(B). An order of dismissal constitutes the final decision of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). An inmate has not exhausted his administrative remedies until he has pursued his grievance through all levels. See Woodford, 548 U.S. at 90; see also Gibbs v. Bureau of Prisons, 986 F.Supp. 941, 943–44 (D.Md. 1997).

In his Amended Complaint, Jordan alleges that he exhausted his administrative remedies appealing the denial of his ARP to the Commissioner and then to the IGO as to each of his claims. And, he has provided some evidence that he has done so. Defendants have failed to offer any evidence that Jordan has not properly exhausted his available administrative remedies.

### 2.    Personal Participation

Jordan has failed to state a claim against Secretary Green and Commissioner Morgan. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (explaining that there is no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct

may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert denied, Stroud v. Shaw, 513 U.S. 831 (1994).

Such evidence is lacking in this case. In his Opposition, Jordan reiterates his argument that Green is "responsible for the overall operations of DPSCS and the IGO," (Opp'n at 9), and that Morgan "is responsible for the overall administration and operation of DPSCS/DOC and supervision of MCE supervisors and correctional staff charged with ensuring they perform duties according to DPSCS regulations," (Id. at 10). Jordan's claims against Green and Morgan are wholly conclusory and divorced from any factual allegations in his Amended Complaint. Jordan baldly claims that the supervisory defendants failed to train or supervise their employees, but Jordan has failed to allege any facts that could give rise to an inference that Green or Bishop had actual or constructive knowledge of the misconduct alleged in this case.

Jordan also alleges that there is a policy to deny disabled inmates access to jobs, but he provides no evidence in support of that allegation. A claim for an alleged violation of constitutional rights may be premised on an allegation that a policy or practice has caused the injury alleged. See Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 691-92 (1978); see also Simons v. Montgomery Cnty. Police Officers, 762 F.2d 30, 33 (4th Cir. 1985). To sustain such a claim, however, a plaintiff must establish (1) the existence of a constitutional violation, see Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that jury's finding that a police officer inflicted no constitutional injury on the plaintiff removed any basis for municipal liability against city and members of police commission), and (2) any constitutional violations were proximately caused by a policy, custom, or practice of the defendants, see Monell, 436 U.S. at 691.

Jordan's generalized assertions that there is a policy that results in disabled inmates being barred from employment at MCE is unsupported by any evidence. Jordan fails to explain the basis for this assertion and fails to identify the policy. In any event, Jordan's claim fails as there is no constitutional violation here.

Lastly, Jordan also cites West, Morgan, and Green's denial of his administrative remedies as evidence of their denial of his rights. (Opp'n at 11). Denial of Jordan's ARP requests and appeals does not alone impose liability. See Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that the wardens "rubber stamped" grievances were not enough to establish personal participation); see also Larson v. Meek, 240 F.App'x 777, 780 (10th Cir. 2007). Thus, the Court will grant summary judgment in favor of Green and

Morgan as there is no evidence that these Defendants were aware of, authorized, or displayed indifference to the misconduct alleged in this case.

Additionally, as to Jordan's claims that his property was deliberately damaged by WCI staff, he does not explain how any of the named Defendants are responsible for such damage to his property. Similarly, as to his claims that he has been denied medical care "for his eye and plethora of other medical issues," he does not provide any facts to explain how any of the named Defendants are responsible for the denial of medical care. As such, these claims are subject to dismissal.

### 3.    Eleventh Amendment

Jordan raises claims against state employees Defendants Seltzer, West, Anderson, Sanders, Green, and Morgan, as well as against state agencies DPSCS and MCE. Under the Eleventh Amendment of the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent or Congressional action. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. See Brandon v. Holt, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims of constitutional violation brought under § 1983. See Pevia v. Hogan, 443 F.Supp.3d 612, 632 (D.Md. 2020). Accordingly, Jordan's constitutional claims against DPSCS and MCE are dismissed. Defendants Seltzer, West, Anderson, Sanders, Green and Morgan are immune from suit for actions taken in their official capacities, and the constitutional claims asserted against them in their official

capacities are likewise dismissed. In contrast, the Eleventh Amendment does not bar Jordan's request for prospective injunctive relief.

### 4.  Fourteenth Amendment

Jordan alleges that he has been discriminated against in his job assignment. The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 2. To bring a due process claim, a plaintiff must first show the existence of a protected property or liberty interest. See Mathews v Eldridge, 424 U.S. 319, 332 (1976); Morrissey v. Brewer, 408 U.S. 471, 481 (1972). A plaintiff may bring a civil action to redress due process violations under 42 U.S.C. § 1983. In the prison context, there are two different types of constitutionally protected liberty interests that may be created by government action. The first is created when there is a state-created entitlement to an early release from incarceration. See e.g., Bd. of Pardons v. Allen, 482 U.S. 369, 380-81 (1987) (state-created liberty interest in parole); Wolff v. McDonnell, 418 U.S. 539, 557 (1974) (state-created liberty interest in good-time credits for satisfactory behavior while in prison). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995); see Wilkinson v. Austin, 545 U.S. 209, 222–24 (2005) (applying the Sandin standard). As the Fourth Circuit noted, "[t]he Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions . . . ." Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015). Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of

prison life" is a "necessarily . . . fact specific" comparative exercise. Beverati v. Smith, 120 F.3d 500, 502–03 (4th Cir. 1997) (citing Sandin, 515 U.S. at 483−84).

The Fourth Circuit explained that "Wilkinson does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." Prieto, 780 F.3d at 250. Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations combined with . . . harsh and atypical conditions" for due process protections to apply. Id. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." Wilkinson, 545 U.S. at 225.

Read liberally, Jordan contends that the failure to return him to his work assignment with MCE after his injury and medical clearance violates his right to due process, as did his subsequent transfer to other facilities. But there is no constitutional right for an inmate prisoner to be housed in a particular prison or to participate in a particular program. See Sandin, 515 U.S. at 484 (concluding that protected liberty interests are generally limited to freedom from restraint which imposes atypical and significant hardship on inmates in relation to ordinary incidents of prison life); McKune v. Lile, 536 U.S. 24, 26 (2002) ("The decision where to house inmates is at the core of prison administrators' expertise."); Meachum v. Fano, 427 U.S. 215, 225 (1976) (holding that the Constitution's Due Process Clause does not "protect a duly convicted prisoner against transfer from one institution to another within the state prison system").

An inmate is simply not constitutionally entitled to a prison job. "[T]he classifications and work assignments of prisoners . . . are matters of prison administration, within the discretion of the prison administrators . . . ." Altizer v. Paderick, 569 F.2d 812, 813 (4th Cir. 1978) ; see also Gibson v. McEvers, 631 F.2d 95, 98 (7th Cir. 1980) ("An inmate's expectation of keeping a certain prison job does not amount to a property or liberty interest entitled to protection under the Due Process Clause."); Weinberger v. United States, 268 F.3d 346, 361 n.6 (6th Cir. 2001) (discretion vested in corrections officials to set conditions of employment precludes implication of a liberty interest); James v. Quinlan, 866 F.2d 627, 630 (3d Cir. 1989) (holding that plaintiffs do not have a liberty interest regarding Federal Prison Industries job assignments arising from federal statutes, specifically, prison regulations); Ingram v. Papalia, 804 F.2d 595, 596 (10th Cir. 1986) (stating that the Constitution does not create a property interest in prison job). Therefore, no liberty interest is implicated here, and Jordan was not entitled to a hearing or an opportunity to be heard on the issue of his employment in a state prison. See Sandin, 515 U.S. at 484.

This Court is unaware of any Maryland law or regulation conferring a protected liberty interest on DPSCS inmates that has been abridged here. As stated, Jordan had no liberty interest in being assigned to a prison job or remaining in that job once assigned. Moreover, the record evidence does not support Jordan's view of his removal from his MCE job. The evidence presented to the Court demonstrates that after the assault on Jordan he was unable to work. Once he was cleared to return to work, there were no vacancies in the shop where he had previously been employed and he was therefore placed on the wait

list to be placed in a position when one became available. Subsequently, he was transferred from ECI at his own request. Reviewing Jordan's allegations in the light most favorable to him, there are no genuine issues of material fact and Defendants are entitled to summary judgment in their favor concerning Jordan's Fourteenth Amendment claim.

### 5.    First Amendment

Jordan's retaliation claim is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005) (citing Suarez, 202 F.3d at 686).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." Shaw v. Murphy, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with [the] status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Specifically, the Fourth

Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker v. S.C. Dep't of Corr., 855 F.3d 533, 545 (4th Cir. 2017).

A plaintiff could establish retaliatory conduct if the defendant took an action that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017), cert. denied, 138 S.Ct. 738 (2018) (internal quotation marks and citations omitted). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. See Constantine, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliatory act was temporally proximate to that activity. Id.

As noted, Jordan was assaulted, which resulted in his being unable to work in the MCE textile shop. Ultimately, in April 2019, he was cleared to return to light duty with eye protection. However, at that time, there were no vacancies at MCE and Jordan was added to the waiting list. Thereafter, Jordan complained about the failure to return him to his job assignment. Jordan asked to be placed on the transfer list and was transferred to MCTC. It was Jordan, not any of the named Defendants, that initiated his transfer from ECI. Moreover, there is no allegation, much less factual support, that his subsequent transfers to WCI and RCI were initiated by any of the named defendants. Moreover, those subsequent transfers, occurring in March of 2020 and July of 2021, did not occur close in time to Jordan's complaints regarding his job assignment at ECI. Without establishing that the individual responsible for the allegedly adverse action knew of Jordan's prior

grievances regarding his job assignment at ECI, and in light of Jordan's own request to transfer from ECI, the Court cannot conclude that Jordan has established a genuine dispute of material fact regarding causation. Thus, Jordan did not allege an essential element of his claim, and the retaliation claim must fail.

**6.     ADA/RA**

Jordan alleges that his claims are also brought under the Americans with Disabilities Act and Rehabilitation Act. These acts generally are construed to impose the same requirements due to the similarity of their language. Baird v. Rose, 192 F.3d 462, 468 (4th Cir. 1999). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Meanwhile, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

To establish a violation of Title II of the ADA or the Rehabilitation Act, Jordan must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities for which they were otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability. See Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 502–03 (4th Cir. 2016). "Discrimination" barred by Title II includes "a failure to make reasonable

modifications" that are "necessary" to provide a disabled individual with "full and equal enjoyment" of the facility's services. 42 U.S.C. § 12182. Title II of the ADA applies to state prisons. See P.A. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998) (stating that "[s]tate prisons fall squarely within the statutory definition of 'public entity'") (citing 42 U.S.C. § 12131).

Title II of the ADA prohibits discrimination by a "public entity." 42 U.S.C. § 12132. The ADA defines "public entity" as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)–(B). "By its plain language, this definition does not include private individuals or private entities." Wright v. Carroll Cnty. Bd. of Educ., No. 11-3103, 2013 WL 4525309, at *19 (D.Md. Aug. 26, 2013) (internal quotation marks and citations omitted). Because the ADA and the Rehabilitation Act apply solely to public entities, Jordan's claims under these statutes cannot proceed against the individual Defendants Green, Morgan, Anderson, and Seltzer. See Baird, 192 F.3d at 471 (upholding the dismissal of ADA claims against individuals because Title II recognizes a cause of action only against public entities, not private individuals); Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2002) (joining the Fifth, Eighth, and Eleventh Circuits in holding that "a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act"); see also Jennings v. Frostburg State Univ., No. ELH-21-656, 2021 WL 5989211, at *10 (D.Md. Dec. 16, 2021) (dismissing individual defendants sued under

the Rehabilitation Act after determining that individual liability is prohibited). Thus, Jordan's ADA and RA claims against these individual defendants must be dismissed.

Jordan's ADA/RA claims asserted against DPSCS and MCE will also fail because he has not shown a violation of the ADA or Rehabilitation Act. As previously stated, to establish a violation of these statutes, Jordan must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability. See Lamone, 813 F.3d at 502–03. Although Jordan has established that he has a disability, he has not shown any discrimination because he has not demonstrated that he was excluded from working at MCE due to his disability. Rather, the record demonstrates that he was placed on the waiting list for a job once medically cleared to return to work. He requested to be transferred from the facility before a job became available to him. Jordan does not allege, much less demonstrate, that he was entitled to be returned to his job as soon as he was medically cleared. On this record, the Court cannot find that DPSCS or MCE violated the ADA or Rehabilitation Act. Therefore, DPSCS and MCE will be entitled to summary judgment on these claims.

### 7.   Injunctive Relief

Jordan seeks injunctive relief directing Defendants to provide him back pay for the time he was not reinstated to his MCE position. (Am. Compl. at 15). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable

harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's

favor; and (4) why the injunction is in the public interest. <u>Winter v. Nat. Res. Def. Council,

Inc.</u>, 555 U.S. 7, 20 (2008). Failure to establish one of these elements is fatal to the request

for injunctive relief. For the reasons discussed above, Jordan has failed to demonstrate the

likelihood of success on the merits. Therefore, his request for injunctive relief must be

denied.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss, or

in the Alternative, for Summary Judgment (ECF No. 25). A separate Order follows.

Entered this 18th day of September, 2023.


_____/s/_____
George L. Russell, III
United States District Judge